Madden, Judge,
delivered the opinion of the court:
The Government made a deduction of $14,076 from money due the plaintiff from the Government, justifying the deduction upon the ground that the plaintiff or its connecting carriers had lost items of that value from another shipment made by the Government. The plaintiff contests the deduction, and sues to recover it, asserting that neither it nor its connecting carriers lost any goods from the shipment in question.
In 1945 the Government shipped several carloads of bales or bundles of coats from Brooklyn, New York, to itself at Army Depot, Atlanta, Georgia. The goods were first loaded by persons employed by the Army upon a lighter operated by the Pennsylvania Railroad. The captain of the lighter counted the bales as they were loaded by using a stroke tally. He counted 1,873 bales. The loading on to the lighter had been done over a three-day period which ended on November 20, 1945. On that day the lighter moved to Pier K of the Jersey City, New Jersey, terminals of the Pennsylvania Railroad Company, arriving there at 4:00 p. m. The captain left the lighter for the night, returning at 8:30 the next morning. Freight carried on lighters is usually locked up. There is no other evidence as to whether this freight was locked up.
A contractor of the Pennsylvania Railroad moved the goods from the lighter and loaded them into three boxcars on November 21. The lighter and the boxcars were so located along the pier that the goods were moved only about *280 70 feet. They were moved on hand trucks, six bales making a truckload. An experienced checker stood at the car door counting the bales, making a tally stroke for each truckload of six bales. The total count for the shipment was 1,873, the same as had been made by the captain of the lighter. The Pennsylvania Railroad, on the bill of lading, acknowledged the receipt of that number of bales.
When the loading was completed, the car doors were closed. Thereafter a carpenter placed “dunnage boards” across the inside of the door frames to keep the cargo from pressing against the doors, and sealed the cars. The loading was completed by 12:30 p. m. on November 21 and the cars were sealed before 3:00 p. m. The railroad maintained 24 hour police and guard service at the pier.
The loaded cars were moved by the Pennsylvania Railroad, two intermediate carriers, and finally the plaintiff to their destination in Atlanta, two of them arriving on November 25 and the third on November 26. Their seals were unbroken upon arrival. They were turned over to the Government at the Atlanta Army Service Forces Depot where they were unloaded. As the bales were removed from the cars, a tally was made by checkers employed by the depot. The railroad had no agent present at the unloading. The tally showed a shortage of 21 bales in one car and 19 bales in another.
Formal written notice of the asserted shortage was given by the Government to the plaintiff on February 19, 1946, almost three months after the unloading of the cars. It is probable that a notice was sent to the plaintiff’s local agent earlier than that, but the evidence indicates that this notice also was considerably delayed. The plaintiff’s claims adjuster after an investigation at the depot reported to his superior that he “could find no discrepancies in the tallies covering the unloading from the cars, classification of the material, and storage record insofar as the Government checker records were concerned.”
The plaintiff carrier does not deny the receipt of the goods. Nor does it assert that the goods were lost by the act of God, or the public enemy, or the nature of the goods themselves, which would be its only valid excuses for failure *281 to deliver. See Chesapeake and Ohio Railway Co. v. Thompson Mfg. Co., 270 U. S. 416, 421. Its defense is that it did deliver the goods, and that the goods alleged to be missing were not in fact missing but because of a miscount at the time of the unloading, were erroneously thought to be missing.
We are not cited to any authority directly in point but we think it must be the law that if a carrier elects, for reasons of economy, to have no agent present at the unloading, and if the consignee makes an admittedly honest and apparently accurate count of the goods unloaded, which count shows a shortage, the carrier has the burden of persuading the trier of fact that the consignee’s count was inaccurate. We think no other rule would be consistent with the carrier’s legal position as an insurer subject only to narrow exceptions. We have no reason to disbelieve, as the plaintiff’s investigating agent had no reason to disbelieve, the Government’s count at the unloading. The plaintiff, having the burden of persuading us to disbelieve the count, therefore loses.
Although the Government was in the advantageous position of being able to pay itself out of other money due from it to the plaintiff, when the plaintiff contested its liability the Government was put under the duty of justifying the deduction by showing that the goods lost were worth the amount deducted. The Government introduced no real proof as to the value of the goods. In the claim made against the railroad there was a statement that each of the 40 bales lost contained 30 coats, and that the unit cost of each coat was $11.73, a total value of $14,076. We think this mere assertion is not a sufficient basis for a finding of value, and we will remand the case to a commissioner of this court to take evidence as to the value of the missing goods.
It is so ordered.
Laramore, Judge; Whitaker, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court having considered the evidence, the report of Commissioner Roald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
*282 1. The plaintiff is a Georgia corporation engaged in the business of a common carrier of persons and property by railroad in intrastate and interstate commerce.
At the time of the events and circumstances involved in this case, the plaintiff corporation was in process of reorganization pursuant to Section 77 of the Bankruptcy Act, 47 Stat. 1474, and its property and assets were held by Merrel P. Callaway, Trustee, in a proceeding in the United States District Court for the Southern District of Georgia, Savannah Division, until July 1,1948, when pursuant to an order of that Court, the Trustee executed a conveyance to the plaintiff of
All right, title and interest of the Trustee in all choses in action, including all claims and demands and all causes of action or pending suits, together with full power, including power of substitution and revocation, for the Trustee, and in his name or in the name of the Grantee, but for the sole use of the Grantee, to ask, demand, sue for, prosecute suits for, collect, receive, compound, or give acquittances for any of the same.
2. Under date of November 20, 1945, the Transportation Officer of the New York Port of Embarkation issued Government bill of lading No. WW-9943353 for the transportation of 1,873 bales of clothing, ex Pennsylvania Railroad lighter No. 467, from the Army Base, Brooklyn, New York, to the Atlanta Army Service Forces Depot, Atlanta, Georgia, via the Pennsylvania Railroad, the Richmond Fredericks-burg & Potomac Railroad, the Atlantic Coast Line Railroad, and the plaintiff Central of Georgia Railway.
3. Over a three-day period ending November 20, 1945, stevedores under contract with the United States Army loaded the shipment covered by the said bill of lading upon Pennsylvania Railroad lighter No. 467 at Pier 3, Army Base, Brooklyn, New York.
The lighter captain, employed by the Pennsylvania Railroad Company, counted the bales of clothing as they were loaded, making a temporary record for each day by stroke tally. Upon the completion of the loading operations, he transferred his stroke tally count onto a permanent tally card record, in evidence as plaintiff’s Exhibit No. 1. This *283 card indicates that all of the 1,873 bales of clothing were loaded onto the lighter.
The shipment was loaded onto the lighter in various lots. The lighter captain recorded a stroke for each group of twenty bales within each lot, except that for the group of less than twenty bales at the end of each lot loading, he indicated the odd number of bales within a circle preceding the final stroke. The last stroke for each lot represented a count of less than twenty bales, which varied through the lots from 2 to 19.
4. On November 20,1945, the lighter was moved to Pier K, Jersey City, New Jersey, terminals of the Pennsylvania Railroad Company, arriving there at 4:00 o’clock in the afternoon. No Government representative was on board the lighter.
There is testimony in this record that freight moving on lighters was usually sealed, but there is no evidence as to whether or not this particular shipment by lighter was so protected.
The lighter remained at Pier K overnight, and the captain did not stay aboard, but returned at 8:30 a. m., November 21, 1945, when unloading operations started. The lighter captain acknowledged that some bales could have been removed from the lighter during his absence.
During a 16-month period covering the month of November 1945, a Government employee assigned to Pier K to check all incoming supplies and equipment in overseas shipments, observed on one occasion that one lighter was left open, from which some amount of personal property of enlisted men and officers was taken, but not Government equipment and supplies. This Government employee did not check the bales removed from the lighter and loaded into the boxcars, but prepared his tally sheets from the loading records of the Pennsylvania Railroad Company.
5. Under existing contract arrangements with the Pennsylvania Railroad Company, the Jersey City Contracting Company transferred the above-described shipment from the lighter into three boxcars on November 21, 1945. The positions of the lighter and the railroad cars along Pier K were correlated for close proximity, and the bales were *284 moved from the lighter for a distance of about 70 to 75 feet across the pier on hand trucks, with individual loads of six bales per trip.
Throughout the loading of each railroad car, an experienced checker stood at the car door and counted the number of bales loaded, recording a tally stroke for each group of six bales. For each car, the count and other pertinent information were written on a loading form provided by the Pennsylvania Railroad Company. The three loading records are in evidence as plaintiff’s Exhibits Nos. 2, 3 and 4, pertinent information on which is summarized as follows:

The total quantity of the shipment thus loaded into the said three boxcars from Pennsylvania Railroad lighter No. 467 amounted to 1,873 bales. With respect to the loading record on car MILW-21014, there are conflicting dates thereon as to the day of loading, but it is clear that the loading occurred November 21.
The checkers had nothing to do with the sealing of the cars, and they did not make the notation on the loading forms with respect to the seal numbers. Upon the completion of the loading of each boxcar, the car doors were closed under the direction of the checker, and the checker and his loading crew moved to other work. The practice at Pier K was that thereafter a cooper would place dunnage boards for doorway protection and apply seals to the car.
6. After the completion of the loading operations, seals were applied to the doors of the three boxcars, and thereafter and before the cars were pulled from the pier, the sealing was inspected by an employee of the Pennsylvania Railroad Company, assigned to the checking of seals on cars. He made a written record of the above-enumerated seals, which was received in evidence as plaintiff’s Exhibit No. 5, and his inspection was made at 3:00 p. m., November 21,1945. He testified that he made a pier check each hour and that the *285 seals would have been placed on the cars within the hour or so preceding his inspection. Usually the loaded cars were sealed within an hour after loading had been completed. There is no direct evidence as to when the cars in question were sealed prior to 3:00 p. m. of that day.
7. Some time after the seal inspection at 3:00 p. m., November 21,1945, the said boxcars were pulled from the pier and taken to a loading scale track and weighed, following which the weight of the contents of each, as well as the seal numbers and number of bales per car were noted by a railroad bill clerk upon the above-mentioned Government bill of lading.
Because of the nature and location of Pier K and the maintenance by the railroad of 24-hour police and guard service thereon, there was very little or no chance of pilferage of any of the bales while they were at the pier.
8. After being track scaled, the three cars were placed in trains on November 21, 1945, and moved from Jersey City, New Jersey, without delay to the Transportation Officer, Atlanta Army Service Forces Depot, Atlanta, Georgia, via the Pennsylvania Railroad, the Richmond Fredericksburg & Potomac Railroad, Seaboard Air Line Railroad, and the Central of Georgia Railway as the delivering carrier.
Cars MILW-21014 and WAB-78891 were delivered November 25,1945, and car NYC-178580 on the following day. At the time of the delivery of the cars, the contents of each of them were protected by the original seals, which were intact and in the same condition as when applied upon the completion of the loading at Pier K in Jersey City, New Jersey.
There is no evidence in this record that the cars had been tampered with or that the contents had in any way been disturbed during the movement between Jersey City and the destination.
9. Under date of February 19, 1946, which was almost three months after the delivery at destination of the three cars in question, the Atlanta Army Service Forces Depot notified the plaintiff in writing that the shipment covered by Government bill of lading No. WW-9943353, generally described as “one thousand eight hundred seventy-three (1873) *286 bales Clothing” was delivered to the depot in a short condition, particularized as follows:
Car MILW-21014 arrived this Depot with shortage of twenty-one (21) bales Coats, Wool Serge. Car WAB-78891 arrived this Depot with shortage of nineteen (19) bales Coats, Wool Serge. Each bale contained 30 Coats, unit cost $11.73 each. Total cost $14076.00.
A similar notation was at some time made on the reverse side of the said bill of lading by the defendant’s transportation agent at the Atlanta Depot. There is testimony in this record that it was the practice at the Atlanta Depot to send a notice of shortages to the local agent of the delivering carrier within two or three days after discovery of the discrepancy, to be followed by a formal notice to the carrier. There is no evidence that such notice was given to the plaintiff’s local agent in this case, except that the first report by the local agent to his main office of a claimed shortage on the shipment in question was made sometime in February 1946.
10. Under date of June 18, 1947, the Finance Office, War Department, notified the plaintiff that it was making a deduction of $14,076.00 from other sums admittedly due the plaintiff from the War Department for other transportation services, and advised that the said sum represented the value of the 40 bundles of wool serge coats claimed to be short in cars MILW-21014 and WAB-78891.
The plaintiff repeatedly protested the deduction, requested refund, and not being paid the money, brought this action for recovery of the sum of $14,076.00.
11. Purportedly pursuant to War Department regulations, not set forth in this record but cited as contained in War Department Technical Manual 12-259, dated July 1945, the defendant’s records pertinent to the unloading of the cars in question and with respect to the defendant’s report of survey covering the investigation of the alleged shortage, were apparently destroyed two years after a so-called procedure of “audit and clearance of the account” which usually occurred within six months after delivery of the shipment. The records analyst at the Atlanta Army Depot testified in this case that such records were destroyed unless it was indicated that a claim was pending.
*287 The defendant’s checker, who handled the unloading of the allegedly short cars, MILW-21014 and WAB-78891, died some time prior to the trial of this case, and there is no direct evidence as to how the particular cars were unloaded or how a count was made as to their contents.
12. Following the formal notice dated February 19, 1946, to the plaintiff of the alleged shortages in the two cars, the plaintiff’s claims adjuster made several visits to the Atlanta Depot in connection with the problem, and also investigated the case at the Jersey City terminals of the Pennsylvania Railroad Company. At the Atlanta Depot, he conferred on three or four occasions with the defendant’s chief of the inventory and adjustment section, who was charged with the accounting for incoming and outgoing shipments and the adjustment of discrepancies with respect thereto.
The defendant’s inventory and adjustment chief testified that he then had in his files stroke tallies on the unloading of the three cars above-enumerated, as well as on seven other cars involved in the shipment of wool serge coats from the Army Base, Brooklyn, New York, to the Atlanta Depot. He further stated that he spread out on a desk all of the documents pertaining to the ten carload shipments, among which were the original stroke tallies, consignor’s shipping documents, inventory record, affidavits, and report of survey on shortages, and that the plaintiff’s claims adjuster went through the whole file. The defendant’s inventory and adjustment chief further stated that the stroke tally records indicated the number of bales unloaded from each car, and that they showed that the MILW-21014 and WAB-78891 cars were actually short 21 and 19 bales respectively. He said that he didn’t know whether the plaintiff’s claims adjuster actually looked at the stroke tallies. The plaintiff’s claims adjuster stated that he had no recollection of seeing any stroke tally on the unloading of any car. He intended to make copies of any such tallies, to check against the loading records made at the Jersey City terminals.
The formal notice to the carrier of the shortages, dated February 19,1946, listed three tally numbers.
13. In a written report, dated June 29, 1946, from the plaintiff’s claims adjuster to the plaintiff’s chief claims agent, it was stated in part as follows:
*288 In checking the detailed tallies in the OS & D Section [Over, Short, and Damaged Section, Atlanta Depot] I could find no discrepancies in the tallies covering the unloading from the cars, classification of the material and storage record insofar as the Government checkers records were concerned. Out of the ten cars received on the above three bills of lading there were overages or shortages from eight of these cars which based on the Government tallys on the out-turn check would indicate that further investigation should be made at loading point. * * *
He testified that by “no discrepancies in the tallies covering the unloading from the cars,” he meant there were no mathematical mistakes on various sheets in the defendant’s files, which purported to show only the total number of bales in each car and the enumerated sizes and quantities of the coats comprising the shipment, but that he could not state that he saw any detailed tallies. In said report, the plaintiff’s claims adjuster detailed the facts sunnnarized in the schedule in Finding No. 14.
14. From about November 19,1945, to November 28,1945, a purported total of 5,773 bales of clothing were shipped from the Army Base, Brooklyn, New York, to the Atlanta Army Service Forces Depot, Atlanta, Georgia, via Pennsylvania Railroad lighters, the Pennsylvania Railroad, connecting carriers, and the plaintiff as the delivering railroad. A summary of these shipments, together with the alleged, shortages or overages in each boxcar, is as follows:

*289 15. The first three cars listed in the schedule in Finding 14 were those involved in the shipment in question. As to the other seven cars, stroke tallies were also prepared by checkers of the Jersey City Contracting Company in loading operations at Pier K of the Jersey City terminals. These stroke tallies indicated that the number of bales loaded into the seven cars were as set forth in the above schedule under “No. of bales billed,” except that as to car MSTL-22036, there were tally strokes representing 551 bales instead of the erroneously computed total of 511 bales set forth on the loading document.
Cars PRR-512034 and SP-18971, under the second bill of lading in the schedule above, were loaded at Pier K from Pennsylvania Railroad lighter No. 393, on the same day as the loading of the cars in question. The latter car was loaded between 11:00 a. m. and 3:25 p. m., during part of which time loading operations were proceeding on two of the cars in question, as shown in Finding 5. Car PRR-512034 was loaded between 1: 30 p. m. and 3: 30 p. m. The other five cars were loaded, four on November 19, and one on November 23,1945.
In the loading of all the three cars in question and two of the other seven, the checkers used a unit of six bales to represent one tally stroke, whereas on three cars, units of ten, and on the two remaining, units of five were employed.
16. In his report heretofore mentioned in Finding 13, the plaintiff’s claims adjuster listed the names of the six Government checkers who handled the unloading operations of the ten boxcars at the Atlanta Depot. All six were experienced checkers whose performance was periodically reviewed and appraised. Five of them testified in this case as to the procedure generally followed in unloading cars, the sixth being the deceased person referred to in Finding.il. None of them purported to recollect or testify concerning the actual unloading operations on any one of the ten cars. In 1945, there were many carload shipments moving into and out of the Atlanta Depot.
17. The unloading procedure generally employed at the Atlanta Depot in November 1945 commenced with the principal storekeeper’s assignment of railroad cars and ware- *290 bouse locations to the various checkers. The individual checker then established his warehouse location and proceeded to the car to be unloaded. He checked the car and door-seal numbers, opened the car door, and looked for any apparent damage.
Generally consignor’s shipping documents, indicating the nature and quantity of the shipment, were either tacked inside of the car or were in the possession of the checker after having been received in the mails. Cars occasionally arrived without documents present, and the checker would then make an independent receiving record.
The containers, bundles or bales were removed from the boxcar under the supervision of the checker, being placed according to garment sizes on various pallets arranged on the platform. The bales were stacked on the individual pallet, with labels visible, for inspection as to the sizes and quantities purportedly contained therein. Usually a standard loading of the pallet was established as to the number of bales. The checker would record a tally stroke for each loaded pallet, or the number of bales on each pallet, which was then removed and transported by a fork lift operator to the designated area in the warehouse.
18. The usual procedure was that the checker tallied the shipment both as to number of bales and as to the quantities and sizes of the garments. Each bale usually had a label as to the stock number, unit, quantity, and size. There is no evidence in this record as to the number of units enclosed in the bales involved'in this case, except for the assertions made by the defendant in its notice of shortage and on the reverse side of the pertinent bill of lading, as set forth in Finding 9.
The checker usually stood at or near the car door during all of the unloading operations. Each checker was assigned one lift operator. One checker testified that he had at times left the car door while his crew was placing merchandise on pallets, to go with his lift operator to the warehouse location, but he checked the pallets upon his return. None of the pallets was to be moved from the platform in his absence.
19. Printed tally forms were provided to the checkers. When the consignor’s shipping documents were available, *291 the stroke tally count would be recorded thereon by the checker, if the shipment was of such a nature that sufficient space was afforded. Otherwise, the count by stroke tally was recorded on a tally sheet. In either event, the record of tally count was signed by the checker and delivered to the principal storekeeper.
Upon completion of the unloading of a car, if the record made by the checker was not in agreement with the shipping documents, then a recheck would be made of the merchandise unloaded, at its location in the warehouse, bale by bale if necessary.
20. The Government checkers in this case were under the supervision of a principal storekeeper, some being assigned permanently, others temporarily. Whenever a discrepancy existed between the shipping documents and the tally count of a checker, the principal storekeeper was advised either by his clerk or a checker. If the discrepancy was substantial, he rechecked the merchandise with the checker. If the problem was not resolved, it was brought to the attention of the chief storekeeper.
21. The chief storekeeper had overall supervision of four warehouses, in one of which the bales in the shipment in question were stored. He testified that he personally recalled the shortage in this case. A few days after the discrepancy occurred, he was notified. With an inventory crew, he assisted in a check of all coats in the warehouse. His finding was that the coats were tallied in right.
22. When the tallies did not agree with the quantities shown on the consignor’s shipping documents, an investigation was conducted by the inventory and adjustment section to determine the point at which the discrepancy occurred. The computations on the tallies were .verified and the total quantities — number of bales multiplied by the quantity per bale — were checked by stock number and size. If the discrepancy persisted, all property of the stock numbers involved was inventoried, and the consignor would be contacted. If the discrepancy still existed, a report of the survey was prepared.
23. The inventory and adjustment chief testified that a report of survey was prepared on the ten-car shipment in *292 volved in. this case, which accumulated all evidence, and had attached to it as exhibits the affidavits of the checkers who tallied the shipment, copies of the tallies, copies of the consignor’s shipping documents, and a purported Army count at the New York Port of Embarkation, including affidavits of the checkers who checked the merchandise at that point. No evidence was offered by the defendant with respect to any such count by the consignor.
The report of survey was prepared in quadruplicate. Usually one copy would be retained in the suspense file of the inventory and adjustment section, and three copies would be forwarded to the commanding officer of the Atlanta Depot. He would appoint a surveying officer, who would investigate the matter and report his findings as to the cause of and responsibility for the discrepancy. Copies of the findings were attached to each of the three copies of the report of survey, which were returned to the commanding officer. He would either approve the recommendations of the surveying officer, or disapprove and appoint a survey board for further investigation. The commanding officer retained one copy in his files, and the original and one copy would be forwarded to the Finance Officer, War Department, Washington, D. C.
One copy of the report of survey would be eventually returned from the Finance Officer to the suspense file of the inventory and adjustment section, and the copy originally placed there would then be destroyed. Apparently all three copies of the report of survey filed at the Atlanta Depot were destroyed, purportedly pursuant to War Department regulations. The file of the commanding officer was to be destroyed three years after its creation, no audit and clearance being involved as in the case of the suspense file. It was represented by the attorney for the defendant that the original copy of the report of survey, sent to and retained by the Finance Officer, Washington, D. C., was lost or mislaid in one of many Government installations in the eastern part of the United States.
None of the documents mentioned in the foregoing Finding are in evidence in this case.
*293 24. The inventory and adjustment chief testified that Army regulations required that shortages found in one car of a shipment be offset against overages found in other cars. When the discrepancies were called to his attention, the entire file was set aside to await the arrival of all cars in the shipment. He stated that the consignor’s shipping documents showed certain sizes loaded into particular cars. Upon their arrival at the Atlanta Depot, the carloads were broken down into actual sizes. The contents of the above-enumerated ten cars did not agree with the consignor’s accounting in the documents as to sizes of the garments purportedly loaded therein. It is not shown that this resulted from any fault on the part of the transporting railroads, as the railroads were charged only with bales of clothing. All tallies were brought together and totalled, by stock number and size, and an inventory was taken to arrive at the net shortage.
The claimed shortage of forty bales was both the overall shortage on the ten boxcars, as shown in Finding 14, and'the total shortage charged against the two cars in issue in this case.
25. Under date of August 27,1946, the Office of the Chief of Transportation, War Department, Washington, D. C., advised the Commanding Officer, Atlanta General Depot, that the report of survey had been referred to it for comment and recommendation, that the plaintiff railroad had protested the Government claim of shortages on the shipment in question, and that the plaintiff had submitted “positive stroke tally with outbound seal records verifying actual loading of 1,873 Bales of Clothing, loaded as follows:
Car_MILW 21014 596 Bales
NXC 176580 762 “
WAB 78891 515 “
Total_ 1, 873 Bales”
The request was made that in view of the above-cited record of the carrier, “certified copy or photostat of positive or stroke tally, prepared as each car was unloaded, be furnished this office.”
Under date of October 7, 1946, the Atlanta Depot forwarded to the Chief of Trasportation “true copies of stroke *294 tallies, covering shipment moving on B/L WV 9943353, Voucher Nos. 46012, 45986, and 45987.”
These three typewritten documents show respectively that 762 bales were unloaded from car NYC 176580,575 bales from car MILW 21014, and 496 bales from car WAB 78891. In connection with the evidence as to the general method o,f unloading cars, each document indicates that a count was made as a pallet of bales was to be removed from the unloading platform to the warehouse. The count was recorded by Arabic numeral rather than by the stroke tally method. The recorded count per pallet was generally 12 bales, but in a number of instances the counts were less, varying from 1 to 10 bales. The documents indicate that the placing of a lesser number than 12 bales on any pallet was a necessary part of the usual procedure of segregating the bales at the unloading-platform in order that a particular size of garment would be transported to a specific location in the warehouse.
26. Except for the statements made by the defendant in its formal notice of shortages and in the notation added to the reverse side of the pertinent bill of lading, there is no evidence that each bale of clothing delivered by the consignor to the Pennsylvania Railroad contained a certain number of garments. It is a reasonable conclusion from all of the evidence that the bales contained wool serge coats.
With the same exception, there is no evidence as to the value of said coats in November 1945 or at any other time, except for the fragmentary statement of the defendant’s inventory and adjustment chief that their “unit cost” was $11.73 each. No statement was made as to when such cost was incurred, nor is there any evidence as to the condition of the coats.
27. The warehouse area at the Atlanta Depot was guarded, and it is unlikely that bales of clothing could have been stolen during unloading operations.
CONCLUSION OP LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff became liable to the United States for the value of 40 bales of coats missing from the shipment described *295 in the findings. The case is remanded to a commissioner of this court for the taking of evidence and a report as to the value of the 40 missing bales.